Morning, ladies and gentlemen. We have four argued cases this morning. Sorry, we have four cases on the calendar. A tax case from the Court of Federal Claims, a patent case from the District Court of Veterans' Appeal, and an employee case from the Merit Systems Protection Board, the latter being submitted under briefs and will not be argued. The first case to be argued is Jade Trading v. United States, 2008, 5045. Mr. Autry, I understood there was a little discussion this morning about an exhibit. I think we had a motion and we denied it. There is a rule that permits chalk forges equivalent solely for the benefit of the Court. If it's not for the benefit of the Court, I don't want to use it. I don't need it. Fine. Thank you. Please proceed. I may please the Court. Three points represent the heart of our appeal. One, no penalty can, should, or has ever been asserted and applied in a partnership-level proceeding where the partnership properly reported its affairs. In fact, in this case, that was the impression that the Court had. For the Internal Revenue Service led the trial court to believe that the error, the disputed basis item here, was reported on the partnership return, the original opinion so reflected. When that was pointed out, there was a clerical order change and that was stricken. That is the single most important fact. Not one case, not one, never, ever has imposed a partnership penalty at the partnership level unless there's been an error on the partnership return. Point two. Well, I point with the transaction of contributing the spread options is disregarded. That changes the partnership return, doesn't it? No, sir. In some circumstances it does. Stobie Creek, it does. There's a 754, there's a special election where it's reflected on the partnership return. I'm prepared to track through the elements of the partnership return and demonstrate no mistake on the partnership return. None. The spread option would never show up any place on the partnership return. That's correct. And in fact, the government's Rule 30b-6 party representative testified so. I believe it was, I can provide you the references to those pages. He said, no, that item, the basis item, is nowhere on the partnership return for it to be reported. It's never reported on the partnership return. And when contributions and distributions. And so this is like so many, unlike so many other cases, but in this case, no error on the partnership return. Which takes us into our second point, Judge Archer, and that is if one reaches outside the partnership proceeding, down into the affected items, the non-partnership items on some of the individual returns, this is a condition that's not universal to all partners. That also distincts this partnership from some of the other cases. And looks to the individual returns of just some of the partners and plucks out that affected item. That basis is reported for the only time on those returns and says we must judge the reasonableness of that position. I submit to you that if you're going to consider the reasonableness of that position, you must be permitted to consider the reasonableness of that position with both eyes open. Any regulation that is invalid by application seems to block your analysis of the reasonableness of that position by saying it's a partner-specific item. It's taken from these specific partners' returns, but we can't consider their reasonableness in applying the penalties. And it's invalid by application. Consistent with that concept that a regulation may be invalid, may be valid, but invalid in regulation is this court held in National Westminster, the 11th Circuit followed the same principle in Horton Homes. Those two cases never cited by the government in their brief. The third point I'd like to share with you, which is the heart of our appeal, is the compact anti-distortion rule. Compact is also a case the government never cites or addresses in their brief. Compact just tells us what it is that we already know, what we learned at our mother's knee. If we're going to make a fair comparison, we have to compare apples and apples. My mother never taught me tax law. Yeah, that's right. I grew up with this before my house. I'm happy for you, and I feel abused. I was abused as a child in so many ways. But when we grew up, one of the first things we learned is if you're going to do a fair comparison, you have to compare with apples and not with oranges. And certainly it would be unfair to take a single apple and put it on one side of the seesaw and stack expenses from 15 months of a growing period for apples and oranges and stack them on the other side. The only fair approach is let's compare either the aggregate expenses with the aggregate benefits or the segregated expenses with the segregated benefits. So we're not talking about apples here. We're talking about puts and calls that matched each other. Precisely. Yeah. And the net expenditure was not $15 million. It was $150,000. Let's bring it down to this case precisely. That's right. Here is the comparison that the trial court made. You take the total trading expenses associated with this planned 15-month program and you add on top of all those trading expenses the total tax advice expenses. You take every conceivable expense ever associated with this program, both tax and trading. And do we compare that to the total anticipated trading profits plus the total anticipated tax benefits, aggregate versus aggregate? No. We compare the universe of expenses, both trading expenses and tax expenses, to just one thin slice of benefits from just one thin slice of trading on just one day. If you look on a segregated basis at that one set of trades, the net equity of $150,000 that Judge Lori, that you raised, fine. Fine. We are told at the time, and it's uncontroverted, every witness confirms, you can double your equity. You can double your money on those things. And if you trade them, you can get better than a double. The sole expense that was essential to the entry of that set of spread options, as opposed to the knockout options, which in the first two weeks offered $3.3 million of potential profit in the aggregate coupled with some other trading. If we are just isolating in fairly and comparing apples and apples, just looking at the spread options, then- Was there any tax opinion as to the knockout options? Well, Your Honor, if this was- There was a big tax opinion. There was a consultancy. It all related to the spread options. That's right. And if you're going to do segregated versus segregated, and if you're going to consider the tax expenses on this side of the seesaw, you need to consider the tax benefits on that side of the seesaw. It was presented as a dual-purpose investment from the beginning. We never denied it, never ran from it. We were quick to say it offered both significant tax benefits and big multiples, big trading multiples. That was the pitch. That was the attraction. If you're going to take the trading expenses for this one set of trades, there's about an $84,000 facility fee that's substituted for the bid-ask. There's lots of testimony as to why that made sense. $84,000 compared to the spread options. And you say, yes, there are also tax advice associated with the acquisition of the spread options, the contribution of the spread options, the withdrawal from the partnership, and the subsequent sale of the asset. There's tax advice through all of that. Fine. If you're going to compare apples and apples, we have to consider, in this dual purpose, the tax benefits on the side. You can't consider just the tax expenses and not consider the tax benefits if you want to make a fair comparison. But the Court of Federal Claims looked at the overall transaction, considered all of these factors, and weighed and evaluated all of them, both in assessing the economic substance of the transaction in its entirety and all of the expenses associated with that transaction in their entirety, and looked and examined and compared them both. You're saying that they made the wrong comparison and only took a slice in considering the cost side of the equation, but I don't read the Court of Federal Claims' opinion that way. Why do you say that they made an improper or she made an improper analysis? Let me see if I can demonstrate this to your satisfaction, Judge Lam. It is absolutely clear that the trial court worked very hard, detailed analysis of all of the expenses and all of the expenses are stacked in there on that side. But when it comes to comparing those expenses to the investment benefit, the investment part of the dual purpose program, she didn't include the knockout option, which in the first two weeks, this was premised on a bullish position on the Euros going up. The first two weeks it continued to go up. They traded just the first two weeks of trading. There's a net profit potential of $3.3 million. That net profit potential is never on the benefit side of the court's analysis. Four times the trial court does this comparison of the universe of the expenses and just the profit potential from those one set of options. And I say to you, no one can fairly compare the universe of both the trading expenses and the tax expenses to just the trading potential of doubling your money on the equity of these options. If you're going to do a fair comparison, you have to consider the totality, your point, the totality of the benefits as well as totality of the expenses. And that clearly was not done. Four different places the court stacks the fees against just the profit potential of those options. And that's the key element of the case. For it is on that analysis that the court concludes that there's not a profit potential on these items where our people were told they could double their money, quote, double their money on these trades. Is your position with respect to the potential profit of this transaction dependent upon the purchase call options being segregated from, separated from the sold call options? That is a second point. The first point on the economic substance analysis is you have to compare apples to apples, or benefits to expenses. The second point is there's an admission by the government, a conclusively established point in this case, that those are separately owned and separately priced. That may be true, but they are also almost inextricably linked together, are they not? Well, that was a phrase, a delinked phrase that came up for the first time in the jurisprudence in 2007 when this opinion came, or actually when the government's expert testified to that, contrary to the position in his book. And we quoted the passage in his book where he testified contrary. In 1999, when these decisions were having to be made, there were five cases. All of them consistently said, no, that you look to the substance of the separate, distinct legal entitlements. Every case so held that they were separate from them, from cottage savings to lorries to Maloney's to Smith, all that line of cases, which takes us kind of into the penalty question. It seems to me that the only way that the profit potential could ever have materialized would be with the transactions separated and that the one call option considered and the other call option ignored. And as I understand the transaction, that was possible, but it would require consent, it would require substantial sums of money that nobody had, and as a practical matter, were unrealistic. The testimony is to the contrary as to how the trading worked. If you look at, people trade these spread options all the time. It's the preferred method of calling according to- Yeah, but they don't trade it with an agreement that really links the two options. No, they do. It's the preferred method. It is the preferred method according to the defendant's expert. I'm into my revolt time. I will just say on the penalty- Well, you can answer the question and then we'll save the rest of your time. Okay, thank you. Your Honor, the book written by the IRS expert says, no, this kind of trading is the preferred method of trading, leveraging up and getting larger multiples in just a straight out spot position. And so I think that the record is clear on that. The question, though, that I would ask you to focus on, in 1999, when these people were making these decisions, is it appropriate to impose penalty at the partnership level? I still haven't gotten to why the partnership return is correct, and I'll touch upon that in my rebuttal, and also to second-guess these people based upon things that developed so many years after the fact. Thank you. We'll give you back your full three minutes. Thank you, sir. Ms. Oppenheimer. Thank you, Your Honor. The judge correctly held there was no economic substance to this transaction, and Coltech What transaction are we really talking about? The transaction that we're talking about is the transfer of the spread to the partnership. And not to the purchase of the spread option. That's correct. It's the transfer to the partnership. That's correct. In Coltech, this court made it clear that the relevant transaction is the transaction giving rise to the tax benefit. That transaction here is the transfer of the spread to the partnership. And it was the transfer to the partnership that lacked economic reality, as this court said in Coltech, because they didn't need to transfer the spread to Jade in order to benefit on any rise in the euros. They could have traded euros or traded spreads in their own account. They could have traded it in their LLCs. And, in fact, putting the spread in the partnership reduced their profit potential because they had the 750,000 new VISTA fee that they had to pay as a condition to get into the Jade partnership. They also had fees that Sentil, the general manager, took. Are you saying if they just bought the calls and sold the other calls the same day, as long as they didn't transfer it into the partnership, it would have been an economically proper transaction? Well, this case would not be here. The reason this case is here is because they transferred. We are never challenging the purchase or the sale of the call option, and those transactions between the Irvine LLC and AAG have never been challenged. In other words, you buy a put or buy a call. Pardon? You buy a call, and the same day you sell a call. We have not challenged that transaction. And at some point those are closed. Those are separate transactions. It's the transfer to the partnership that's key here. That's the only transaction that's at issue. And similarly, it's also irrelevant whether Jade engaged in trading the knockout option. All that other stuff has no bearing here because this court in Coltac emphasized that the relevant transaction is the transaction giving rise to the tax benefit, which was the transfer of the spread to Jade trading. And did those both occur the same day? The spread and the knockout options? The transfer of the two, the spread to the partnership to Jade. Those occurred on the same day? Well, the same, I think. Tell me how the spread, the purchase and the sale, how they were transferred to Jade. Well, I think at some point in September the Irvine LLCs purchased, engaged in the spread transaction with AAG. And then a few days later in October, October 6th, I believe, they entered Jade by paying a cash contribution of $75,000 and contributing the spread to Jade. And the spread premium, the differential in premium which they paid AAG was $150,000. So they actually contributed $225,000 to Jade. When they redeemed their partnership interest in Jade, they had a loss of $100,000. But by virtue of participating in Jade, they claimed a $15 million tax write-off on their return. That lacked economic substance. And as far as the slicing and dicing of the fees that Jade or that opposing counsel wishes you to engage in, in order to somehow conclude there was a profit potential, no such profit potential was possible and the court correctly analyzed it. Both parties' experts testified that the maximum profit potential that could be realized on the spread transaction would be $140,000. Against this maximum profit potential, there were a number of fees. First of all, since the spread was transferred to Jade, Jade took a 20% profit off the top. So you're down to $112,000. Jade has conceded in its opening brief that the AAG account opening fee is properly applied against this profit so that this fee is $84,000. So we're now down to about $25,000 that's left. The Irvine LLCs also paid $100,000 for a legal opinion. The whole purpose of the legal opinion was to basically say that by virtue of transferring these options to Jade, you're going to get a stepped-up basis in the partnership interest, which will enable you to claim a loss. Switching gears a little bit, the defense of reasonableness, which the regulation says could not have been dealt with at the partnership level. Your opponent didn't get a chance to say it and didn't want to say it, but I wanted you to get your digs in one way or another. Why is that not in conflict with the statute? You mean being able to assert the reasonable cost of that? The reasonableness at the partnership level. Well, there is no statute that specifically entitles the Irvines to assert the reasonable cost defense at the partnership level. The statutes 66-64 entitles them to assert a reasonable cost defense, but it doesn't define, it doesn't say and this defense must be asserted at the partnership level. Section 66-64 simply gives them, you know, the right to make this defense. It doesn't say where. It's sort of counterintuitive, isn't it? Well, I mean, it's a decision that is made. The statutes, the 1997 amendments to the code, to 62-21 and to 62-26 and 62-34, specifically require a penalty relating to an adjustment to a partnership item to be determined at a partnership level. And the statutes are silent as to where reasonable cost defense must be asserted. So the Treasury Department promulgated a temporary regulation, which is now permanent, which basically says that the reasonable cost defense must be asserted at the partner level. So there's an omission in the statute and the agency charged with the implementation of the statute has filled the omission chevron. That's exactly our position, Your Honor. I couldn't have said it better. I've noticed in the statute, 62-21, which deals with partnership level matters, talks about the applicability of any penalty being determined at the partnership level. Correct. And 66-64 talks about the assertion of a reasonable cost defense being a partner level, an individual item. So it seems rather odd, as Judge Lurie pointed out, that you have the applicability of a penalty made at the partner level, but then the defense, the reasonable cost defense being asserted as an individual matter. But I notice that the statute uses different words. In 62-21, it talks about the applicability of any penalty, and 66-64 talks about the imposition of a penalty. Is it fair to say that these two statutes read together, or the two statutes can be read together, that the applicability of any penalty is determined at the partnership level, but then whether it's imposed or not, and whether any defenses relate to that penalty, are determined as a matter of partner level determination? Well, that's our position, Your Honor. Section 66-64 doesn't simply apply to partnership proceedings. Section 66-64 has been in the Code for years and years and years, and it relates to all kinds of proceedings. It relates to ordinary deficiency proceedings that don't involve partnerships. They might involve individuals. They might involve corporations. But any kind of proceeding where a penalty is inserted under Section 66-62, a defense to the penalty, reasonable cost defense penalty, could be asserted. So 66-64 applies to many proceedings. But not proceedings at the partnership level. So then you have a partnership level. Is that right? But not to the proceedings at the partnership level? Well, they can assert a defense, but they assert it in their individual partner level proceeding. In other words, so then the question is how? But again, I'm confused. Are you saying that the reasonable cost defense under 66-64 can or cannot be asserted in a partnership level proceeding? It cannot be asserted in a partnership level proceeding because Congress's intent in establishing partnership level proceedings was to try issues common to the partnership in a partnership proceeding and to try issues that each partner might have a separate, you know, defense in individual proceedings. For example, many-time promoters would be a member, a limited partner, just as other partners, and a promoter's reasonable cost defense would be a different defense, for example, than the defense of an individual partner. And so it would make perfect sense to have them try an individual partner level proceedings. Congress in 1997, when it amended the Tefra statutes, made it quite clear that penalties relating to adjustments to partnership items are to be determined at the partnership level. But it did not at the same time state that the reasonable cost defenses are to be determined at the partnership level. And in fact, the legislative history is directly to the contrary of the position that Jade is advocating. The legislative history, which is cited on page 58 of the brief, says, the bill provides that the partnership level proceeding is to include a determination of the applicability of penalties at the partnership level. However, the provision allows partners to raise any partner level defenses in a refund forum. So the legislative history shows Congress's intent in that regard. So that means that Congress intended that penalty determinations must be litigated twice, two proceedings. Once at the partnership level to determine whether a penalty is applicable, and then at the individual level to determine whether there are any defenses. Is that right? The penalty is determined only once at the partnership level. Defenses are determined only once, and that is at the individual partner level proceeding. But to determine both requires litigating in two different proceedings. That's correct, Your Honor. And if the defense fails, the application of the penalty therefore also fails. The application at the partnership level would fail if the partner succeeds in the defense. Well, if one partner succeeds in his defense, the penalty would not be imposed as to him. If another partner, the defense fails, the penalty is imposed as to him. Again, nothing is really imposed at a partnership level. A partnership is a pass-through entity. So everything, the tax and the penalties, are imposed really at the individual level. But Congress made the determination that issues common to all the partners should be determined in one proceeding and that issues that would be individual as to individual partners would be determined in individual proceedings. And in these cases, the ravines are perhaps similarly situated, but in other cases you could have a hundred-member partnership and each person's reasonable cause defense could be different. So I think Congress's judgment is sound in that regard. In any event, you're saying it's reasonable. Yes, that's right, John. I'd like to make a response to Jade's argument that there was no error in the partnership return. The regulation defines partnership item very broadly. The regulation is 301.6231-A3-1. So partnership item isn't simply an item of income, deduction, loss, or credit reported on a return. It also includes the accounting practices and the legal factual determinations that underlie the determination of items of income, credit, gain, loss, deduction, et cetera. So the fact that the contribution of the spread to Jade lacked economic substance is a partnership item under the regulation, and the fact that it is a partnership item gave the court jurisdiction over these proceedings and jurisdiction to impose penalties relating to the applicability of this partnership item. Thank you, Ms. Oppenheimer. Mr. Autry has three minutes. Thank you, Senator McKibben. Directly to your point, the regulation is not applicable in this case because you're not forced to this bizarre circumstance where you litigate the penalty in the partnership proceeding and then you go out for a refund action and litigate whether or not the penalty applies because of reasonable cause. And in the meantime, you drop down and have a partner-level affected item proceeding. Those are the three potential proceedings here. But in this case, you don't have that problem. And the reason you don't have that problem goes to Ms. Oppenheimer's comment. You only deal with the partnership level on the matters common to all partnerships. In this particular situation, the penalties, the applicability of penalties, that statute 6221 that you were citing, Judge Land, says the applicability of any penalties as it relates to partnership items. This is an affected item. As the government told you, this outside basis which is drawn from the individual return is an affected item. Ms. Oppenheimer just said that this was a partnership item under the regulations. She said the economic substance was. But if you look to the basis and you look to the government's position below and you look to the government's position in every other case, Dial and Guston, the outside basis which is not reported on the partnership return is an affected item. And because we're talking about the penalty as an affected item, then what happens if a penalty applies in the affected item partner level litigation that follows the partnership litigation, you address, look, did you guys mess up on your particular return unlike the other partners? And this only impacts three of the five partners. If you did, you got penalties. If you dealt with it reasonably, that is, we can deal with the applicability and inapplicability in the same proceeding, that makes sense. That makes sense above all else. Even if it were a partnership, to your point, Judge Archer, let's assume for a moment it's a partnership item. If the partner-specific item is drawn up into the partnership proceeding, then it's on the return of the individual partners.  and National Westminster, Horton Homes, and the 11th Circuit. To your point, the Chevron analysis, actually, there was a wonderful seminar last week, ABA tax section sponsored, and it talked about in this circumstance there being actually four steps to Chevron. Chevron is premised upon the proposition that if we're talking about ampage for utility grids, it's good to have the agency making those decisions, not the court. What the D.C. Circuit said in Murphy is in matters of judicial jurisdiction, the agency doesn't have special expertise there. The courts have special expertise. That's the preliminary step. The second step, which is sometimes referred to as the Chevron step zero, says where you have an APA violation, you're off, you're back into the traditional view where the courts are in charge. Here the government says the regulation is a legislative regulation. If it's a legislative regulation, it violates section 553 of the APA, and so you're back to looking at some respect but not deference. The first step stated in Chevron is is there a statute directly in point? Yes, there is. The third step is fine, we're going to give deference unless it goes to your point, override, repeals, contracts, modifies the statute. Thank you. Thank you, sir. Mr. Autry will take the case under submission and we'll decide it at this partnership level. Oh, grand, grand. Thanks, sir.